Good afternoon, Your Honors. May it please the Court, my name is Alan Yatvin, I'm counsel for M.R. With me at counsel table is Jennifer Lohmann, who is counsel for the AMICHE, the Education Law Center of Pennsylvania, and the Disabilities Association of Pennsylvania. Okay, and who is reserving rebuttal? Your Honor, I am reserving two minutes rebuttal with the Court's permission. Okay. We'll have both of you argue before Mr. Riley argues, and then you'll have your rebuttal. Yes, Your Honor. Thank you. Your Honor, the hearing officer in this case, the Pennsylvania Special Education Due Process Hearing Officer, heard three days of testimony, nearly 500 pages of testimony, 1,800 pages of exhibits, issued a decision with 64 paragraphs of findings of fact, including footnotes, and issued a 21-page single-space decision. In that decision, she carefully analyzed the issues that were presented at the due process hearing. Ridley appealed by filing a petition for review with the Commonwealth Court, which I removed to district court. At that point, it was no longer an appeal. It was actually a new civil action pursuant to the IDEA. The district court took the matter after receiving briefs and motions, cross motions, for judgment on the record. There was no evidence supplementing the record submitted to the district court. The district court reversed the hearing officer on every ground in which she had granted relief to the parents in this case. We submit that the district court committed clear error in its factual findings, and additionally, that the district court did not apply the proper standards of review when it was examining the case. Well, I'm glad you brought up the standard of review generally. I mean, it's a high-heeled decline. You know, we review the findings of the district court under clear error. That's a tough standard of review. It is a high standard. I don't shy away from it. But I do want to point out, and I ask the court to perhaps reread Judge Greenberg's opinion in DS, where the court looks at the actual findings of fact for clear error, but the court also looks at those same findings in a slightly different way by determining whether the court, in reaching those findings, applied the proper deferential standard of review. And I submit that under either of those tests, in this case, that the parents should have prevailed and the district court erred. But the deferential standard would apply to factual findings found by the hearing officer. That's correct. Correct? And we have, you pointed out, there are extensive factual findings here, none of which pertain to what's the focus on appeal and what the district court disagreed with. And that has to do with this research-based, peer-reviewed reading program. There's three lines in the hearing officer's extensive discussion that relate at all to this. Well, actually, there's more than that, because the hearing officer says it was not, and then later says that the research was flawed, the training, which has flaws. But there is not anything in the factual findings about this program. And so when it comes to the district court, if you don't have findings to defer to, you're free to see what supported this legal, this conclusion, if you will, and you don't really owe deference to that finding. Well, I think that that actually has a couple layers. First of all, the hearing officer found that the IEP, and it was the May iteration and then the slightly supplemented iteration on June 9th, that the hearing officer found that the IEP lacked appropriate, specially designed instruction. But that's not in the findings of fact, that's on page 69. You're correct, Your Honor. So that's a legal, that's a, what was, that was, what's appropriate, if you will. It's not a finding of fact. Well, Your Honor, I'm not sure it's not a finding of fact. That the court had the specific paragraph findings of fact, but when the court is also stating facts in support of its legal conclusions, I would submit that those are also findings of fact. But what's important is that the district court is looking at this decision by the hearing officer, and it's determining, well, does this IEP offer FAPE? Are there appropriate, specially designed instruction in this IEP? And the answer is unequivocally no. Now, the district has argued, and the district court did not address, the fact that there are some things in the NOREP, the Notice of Recommended Educational Placement. But if you look at the district court's opinion at 828 of the record, the district court discusses things that are not in the IEP, and it's finding that the IEP was, to quote the court, the unrefuted reflects that the IEP contained the following, resource room, learning support, decoding comprehension, computation and reasoning skills, written language disabilities. None of those are in the IEP. No, but weren't they, in effect, addendums to the IEP? You know, the, this court has said that the IEP is the centerpiece of the special education program, and that it must contain, in fact, I think you wrote it, Judge, in New Milford, that the IEP must contain a specific statement of the student's present abilities, goals, and services designed to meet those goals. Okay. Has to be in the IEP. And the reason it's important is because the IEP is what the educational program is based on. Now, the district has argued, oh, well, it's just procedural, and unless we can show prejudice, it's not a, it's a substance of the IEP. Right. Exactly. And, and in DS, the, the court states that the substance of an IEP is not a procedural matter. It goes to the heart of what the educational program is. But, but everybody knew what was proposed to be provided here. What's your argument? Is your argument that what was supposed, proposed to be provided didn't provide a, a beneficial education, a meaningful benefit? Is that, is that your argument? What specifically are you arguing that the district court got wrong in terms of the issue? We didn't, didn't know what was being provided because all we have is the district court looking at the NAREP, the Notice of Recommended Educational Placement, and saying these things are in there. There was no other. Doesn't that come down to Project READ? Isn't that really the problem? If they had offered Wilson instead of Project READ, we wouldn't be here? If they had offered Wilson and specified what, what specific specially designed instruction was going to address the child's disabilities in Wilson, then we might not be here. I mean, is that really what the law requires? The law require, a, yes, the law requires that a child be evaluated. And in that evaluation, the disabilities are identified. Once the disabilities are identified, then the IEP ascertains what the child's levels are, their, their current levels, then looks at goals for that child based on those levels, and then how we are going to achieve those goals with specially designed instruction for that child addressing those. And throw a dictionary on the table and say, well, all the words are in there to become an astrophysicist, but the fact of the matter is, that's not the program. However, even if the, the, the statement of, we're going to give Project READ was sufficient specially designed instruction, it did not provide FAPE. Because the district court, I submit, was in error when it said peer reviewed, research based instruction is not required, and, and counsel for the AMICHI will be addressing that. It seems to me that the problem with your argument, and I understand, you know, where your argument's coming from. The problem with your argument is if we were to accept it, it's going to take away so much more of the decision making from the local districts and the parents by having, having micromanagement of the actual instructional components in the IEP. Because that's what you're really looking at here, and you're saying, your clients basically said, look, Project READ isn't going to work. Because it hasn't been peer reviewed enough. Right. And we want Wilson. But even Wilson, the, the What Works Clearinghouse hadn't endorsed Wilson. You were just saying, we want Wilson, we don't want Project READ. No, I'm not saying we want Wilson, we want, we don't want Project READ. What I'm saying is, I'm not required, the parents are not able to request a specific program, but they are able to insist upon a program that meets the requirements of the IDEA, which is that it be research based. And I specifically. To the extent practicable. Yeah, Florida Center for Reading Research has a review of it and talks about phonics, intervention groups, promising strategies, and it has five pages. Maybe it's not, you know, everything that you want, but it's certainly, there has been research. And I think along the lines of Judge Fisher's question, how, what is sufficient? And the statute says, research to the extent practical in order to do certain things. It's not the be all and end all. It's to accomplish certain things. And if the, if the school, you know, if the school is totally wrong that there is no research to support that, you know, it, you know, it works, then, then there's a real problem. But here, you know, are we, are the courts and the hearing officers supposed to second guess the, the district when at least it seems arguably within those bounds? Well under the IDEA, it is the state that is the ultimate arbiter, and in this case, the voice of the state is the hearing officer. And the hearing officer, having reviewed those five pages, and I ask you to look at my reply, I'm out of time, Your Honor. May I have a couple more minutes? Put another two minutes on, yes, uh-huh. If, if, look at my reply brief, I, I asked the special education director and the special education teacher, point blank, is there anything that you know about Project READ that tells you that it's appropriate for a child with learning disabilities like this child? And the answer was no. Yeah, but that's the other thing. If you're going to say that every IEP has to be so tailored that there has to have been research with respect to this specific constellation of, of problems with a child, it's, it's just not, I don't know, it seems to me that the statute doesn't say peer review research totally attuned to every disability that the child has. It's, it's just creates a problem. There's a difference between totally attuned and some attuning. And as the, the witnesses said, point blank, it's not. And the district court didn't even mention that testimony in overruling it, didn't even mention that Project READ, uh, REVIEW itself from, from Florida acknowledges that the research is inconclusive. And that's the problem, that the district court ignored those facts in the record in making, substituting its judgment as to appropriateness for that of the due process hearing officer. Okay, counsel, we'll, we'll, oh. If I may, I, if I have a few seconds more, I did want to address the, um, 504 aspect of the case. All right. Um, the, the 504 issues involved, um, a child who had needs that could be accommodated in the classroom transparently, um, along with the other children. And the district court does not dispute any of the factual findings, does not dispute any of the facts in the record, simply says, I reach a different conclusion, that, uh, there was no deprivation of the educational activity. The district court ignores the fact that every one of these programs, Clifford Day was connected to reading Clifford. Apple and Pumpkin's Day was connected to reading the Apple and Pumpkin's book. Earth Day was connected to the Earth Day project. Everything was integrated part of the educational experience, and the district court completely ignores that. Okay. Thank you. Thank you very much. All right. We'll hear from you on rebuttal. Ms. Lohmann? Good afternoon, Your Honors. May it please the Court, my name is Jennifer Lohmann, and I represent the Learning Disabilities Association of Pennsylvania and the Education Law Center in support of appellate in this matter. The district court did two things in this case. I'm going to focus on the first thing. Mr. Yatbins has already focused on the second thing. The second thing was that the district court did that we have concerns about that we believe the district court erred was that it substituted its own judgment for the findings of the hearing officer when the hearing officer found that the reading program proposed by the school district was not appropriate to meet this child's unique needs. What I want to focus on is what the first thing that the district court held was that peer-reviewed research services are in no way mandated as parents urge. How did the district court get it wrong? Basically, what the district court failed to look at was the plain language of the statute. The statute says that special education and related services and supplementary aids and services have to be based on peer-reviewed research to the extent practicable. Now, there's a lot of argument about what does it mean for the extent practicable. Actually, the IDEA regulations which were promulgated in August of 2006 in response to the extensively amended statute in 2004 shed some light on what it means, what the phrase to extent practicable means. What the regulations say, and I'm quoting now, is that states, school districts, and school personnel must select and use methods that research has shown to be effective to the extent that methods based on peer-reviewed research are available. That's what the U.S. Department of Education's comments are about what it means to the extent practicable, that if there's methods that are based on peer-reviewed research that match the child's needs. Because, again, we always have to go back to Raleigh, correct, and the Third Circuit's, our circuit's decisions on what it means for a program to be appropriate. It has to be reasonably calculated to match the individual child's needs. So it's not just the fact that there are research, there's lots of reading programs out. You're correct. You can go on the Florida Center for Reading Research. You can go on the What Works Clearinghouse and in about 10 seconds find all kinds of research-based reading programs. The issue here, and for every case involving an IDEA case, is whether or not it's individually tailored to match that child's unique needs. So how, from that, how is the district court wrong in saying that peer-reviewed research is not mandated? It's mandated in the sense that the district court basically says it's not required. But the IDEA says it's required to the extent practicable, meaning if it's readily available. I think the whole problem with your argument is that the words themselves are ambiguous. Are they not? I actually think to the extent practicable, like I said, the U.S. Department of Ed kind of expounded on that a little bit, not in the regulations themselves. I don't think they're all that ambiguous. If it's available, that's the one thing that Congress tried to do here when they amended the IDEA in 2004, is they focused on the fact that there had been an achievement gap between kids with disabilities and kids without disabilities for a long time, even though the IDEA had been in effect since 1975. Congress found, when it made these amendments, and I know my time is up. I can stop. Well, the interesting thing is the provision that has peer-reviewed research is not practicable. To be provided to the child says nothing about individualized. It says to advance appropriately, to be involved and make progress, to be educated and participate. It doesn't say, it doesn't impose the issue that, you know, there has to be, you know, has to be an, you have to look back at the first part of that, that statement, that section 1414, D1Ai, you have to love the IDEA, it sort of goes on and on. It says, a statement of the special education, and special education is defined as specially designed instruction to meet the child's unique needs. So that's what we're saying, the specially designed instruction to meet the child's unique needs, comma, based on peer review. As a practical matter, since you know a lot in this area, how does this project read not fit? It talks about encoding and decoding, it's multi-sensory, it has phonics, which was a concern. How, what did they have to do in terms of research? It doesn't have research to show that it's worked with kids with learning disabilities, and Wilson does. Well, it has kids who are in the 25th, under the 25th percentile, at-risk students. Those are different from kids who have already been identified as meeting the IDEA's eligibility requirements for having a specific learning disability. So they had to have done research specifically. Yeah. See, that's an issue, totally nuts and bolts. I mean, how is one to go about knowing whether something's peer reviewed? It's easy. How does just a parent? You go on, you go on the, this is what, this is a good question, and that's what the Department of Ed asked itself. And this isn't in the record. None of this is in the record, is it, what is really needed to be research-based peer reviewed, and the hearing officer doesn't give us any help with that. Right. I mean, you go on, you go on, this is another place, actually, where the regulations do help too, the comments to the IDEA regulations. They also give some help on what it means to be peer reviewed. It says, school personnel must select and use methods that research has shown to be effective. And then on the other part of the regulations, they say, peer reviewed research generally refers to research that is reviewed by qualified and independent reviewers to ensure that the quality of the information meets the standards of the field before the research is published. Who bears the burden of showing something's peer reviewed? I mean, does the, are we going to tell the school district you have to show the parents that this is peer reviewed? Yeah, that now becomes part of the IDEA. That becomes part of the IEP. When Congress amended the IEP in 2004, it said. No, no, you're trying to make that part of the, you're trying to make that part of the IDEA. But it said. It says. It says, in the purpose section, it says, we find, I'm going to read it again, quote again, that what we found is that for many, many years, special education, the delivery and the implementation of the IDEA has been impeded by an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities. That comes right out of the purpose section of the statute. 20 U.S.C. Section 1400 C.4. So are research based instructional methods always peer reviewed? Not always. And that's why, that's why in the comments to the IDEA regulations, the Department of Ed said, we don't want to define peer reviewed research. Because there are going to be instances where what's appropriate for children is not peer reviewed. I'll give you an example. More and more children with autism are in need of music therapy. That doesn't have a peer reviewed research basis. But there are plenty of people who believe that type of service is appropriate for children with autism. So there are different types. There are certainly going to be services which are not going to have a peer reviewed research basis. But in this case, in reading, there are plenty of programs. The school district could have chosen from Wilson Reading. They could have chosen from Orrin Gillingham. They could have chosen from Linda Mood-Bell. Those reading programs all have a peer reviewed research basis that shows they're appropriate for children with learning disabilities like ER. They didn't. They chose a Project Read, which is a perfectly fine program. I'm not saying it's not. Many, many school districts use it. What the issue with Project Read is that it didn't match up to her individual needs. It wasn't appropriate to meet her individual needs, which is really what the hearing officer found in this case. I have much overstepped my time. If you have any further questions for me, I'm happy to answer them. Thank you. Thank you very much. Good afternoon. May it please the Court. John Riley on behalf of the Ridley School District. I would ask the Court to consider first, there's no question that the IDEA requires the peer reviewed research to be considered in determining what's appropriate education for a child. However, it needs to be read in pari materia with the rest of the IDEA. Specifically, the portion of the IDEA that requires proof of substantive harm before a parent or a child is entitled to relief that is compensatory education or tuition reimbursement. That section of IDEA says a procedural violation is a denial of FAPE, a free appropriate public education, only if it results in a loss of educational opportunity, deprives the parents of their participation rights, or causes a deprivation of educational benefits. That was the District Court's point when it said that the failure of a public agency to provide services based on peer reviewed research would not automatically result in a denial of FAPE. That's because there also has to be proof of substantive harm. We're talking here about payment for benchmark, and we're also talking about compensatory education? That's correct. We're talking about dollars as well as, I think it's 360 hours of compensatory education? The compensatory education would be awarded in hours, but typically translated into dollars. So all of that is dependent upon defining a substantial harm? Yes. The court would have to find that the school district violated the peer reviewed research provision, and that it caused substantive harm to the child. That's not what the District Court found. Moreover, it's not what the hearing officer found. That means that the parent can't take the child out of the school until the child's been harmed? No. The parent is free to withdraw their child from school at any time and to enroll that child in private school, but then the parent bears the financial burden of that private placement. Then it's not the school district's responsibility. But then the parent can get compensated for that only if the parent shows that it would have caused substantial harm? Only if the parent can show that the IEP or the district's failure in the IEP caused a loss of educational opportunity or a deprivation of educational benefits. That's not what happened here to begin where we started, which is with the hearing officer's opinion. Of course, that's where the District Court started, as it was required to do. The District Court pointed out, Judge Rendell, you pointed out as well, that the hearing officer's finding, such as it is, about the IEP is one sentence. It lacked appropriate, specially designed instruction in the form of a research-based, peer-reviewed reading program. That's the totality of its analysis. What's more important is footnote 10 at page 9 of the hearing officer's opinion, in which the hearing officer credits the document that you were referring to earlier, Judge Rendell, the Florida Center for Reading Research. The hearing officer actually credits that document. And the hearing officer writes, project READ is a comprehensive language arts program designed to provide explicit instruction, a structured reading curriculum. It may be implemented in a regular classroom, in special education classes. It may be used as an intervention reading program. It was designed, I'm quoting from it now, it's designed to be research-based. And the students made progress in reading. However, but, there were flaws in the research which made it impossible to attribute the reading growth the students experienced to project READ alone. So even the hearing officer credited that document that the district introduced, concluded that project READ was research-based, and was appropriate for special education students, but then went on essentially to evaluate the quality of the research, and not to evaluate the instruction that the school district was delivering. That was the hearing officer's error. It was a legal error. It wasn't a factual, wasn't a factual finding that was, or certainly not a credibility finding that was entitled to deference. It was a legal finding that the hearing officer properly reversed. The record, as you pointed out, Judge Randell, not merely the record itself, but the hearing officer's own findings show that project READ is peer-reviewed. And you argue that it was peer-reviewed, do you not? I did. The school district actually introduced that evidence. That was one of the school district's exhibits, as I recall, and introduced testimony as well from the special education director about the research that was conducted on project READ. Now, we're going to have to write on this. As far as I can tell, there's no published Court of Appeals decision talking about this peer-review provision. Let me ask you, you say in your brief on page 39 that the idea requires a school district to the extent possible to use peer-reviewed material. Is that really a lot different than what Amicus is saying? No. No, it's not. I agree that the peer-reviewed research provision is part of IDEA. And the record shows that the school district did consider that provision in preparing the IEP for ER in this case. The discussion over the reading program that the district intended to implement for her education was part of the discussion with the IEP team with the parents of the student. Let me follow up. If you two are sort of in agreement, what about the district court? Did the district court get it wrong, how it dealt with that particular provision? No, I just think that it's a matter of expression. I'm trying to express it in what I believe is a clearer way, which is that the peer-reviewed research provision needs to be read in pari materia with the requirement that for an award of compensatory education or tuition reimbursement, there has to be proof of substantive harm. In other words, that a procedural violation doesn't result in an award of comp ed or tuition reimbursement without proof of substantive harm. Is that what the district court said? No, not precisely, Your Honor. No, not precisely. The district court adopted the phrase of the Eastern District of California in the Joshua A. case and said, there's nothing in the act to suggest that the failure of a public agency to provide services based on peer-reviewed research would automatically result in a denial of state. Are you conceding a procedural violation then? No, not at all. I'm stating just as a way to approach this, as a way to start with the IDEA, that a procedural violation doesn't support an award of relief unless it has caused substantive harm. And you're also saying that the hearing officer really found that Project READ was peer-reviewed? Exactly, Your Honor. That's exactly my point. The document that the hearing officer credited, that document to which you referred, the Florida Center for Reading Research, credited that. So the sole reason that the hearing officer found the IEP did not comply was because, quote, there were flaws in the research which made it impossible to attribute the reading growth the students experienced to Project READ alone. That can't possibly be substantive harm. It can't possibly be a basis for a comp ed or a tuition reimbursement award. Otherwise, you wind up with hearing officers, district courts, courts of appeals, evaluating research. Mr. Raleigh, one of the things you do concede, I believe in your brief, is that the district court got the question of who has the burden of persuasion before the district court wrong. It was partly correct. The parents had the burden of persuasion on their claim about kindergarten. I had the burden of persuasion on the claims about... But the district court said that at the time they were before the district court that the parents had the burden of persuasion on both facets of the case, did they not? Yes, it did. The district court said that in the introduction to its memorandum. However, the district court did not state anywhere in its memorandum that it believed that the issues were close. How can you say they weren't close when the hearing officer and the district court came to different conclusions on the basic issues? Because the burden of persuasion under Schaefer v. Wiest only comes into play in the rare case where the evidence is in equipoise. Or where there's new evidence presented, wouldn't it be? The district court really is acting totally in a review function. That's correct. So it's not really a matter of burden of persuasion, it's a matter of the standard of review. That's correct, and that's why I said that the district court's statement of the burden of persuasion was harmless because it didn't use it. The burden of persuasion would only come into play where the evidence was in equipoise. The Supreme Court in the Schaefer case said, cases applying Schaefer are going to be very rare because cases are so rarely in equipoise. And in fact, the district court of the hearing officer in Schaefer concluded that the evidence was in equipoise and simply used the burden of persuasion as a way of settling the tie. If the district court had used the burden of persuasion here, I would expect, I'm sure the Court of Appeals would expect, that it would have said the evidence is in equipoise and I'm using the burden of persuasion. In this case, ER was clearly struggling at the beginning of first grade. Why did Ridley wait, why did the school district wait until November to do the reevaluation? That's because ER had been evaluated before kindergarten and found not to be disabled, learning disabled, had been evaluated in kindergarten by Ridley, not once, but three times, and had successfully completed the kindergarten curriculum. So the context of those first two months of first grade are very important. The context is that the school district was consistently willing, demonstrated its willingness to evaluate ER, and that at the beginning of first grade, ER was in regular education because she was not a student with a disability. So it was natural for the school district to try to observe and assist her in the regular education curriculum before agreeing to the parents' request for the evaluation in November. And the parents approved the original evaluations and proposals in first grade? The parents signed a notice of educational placement, placing her in regular education for first grade, given all of that, all of the evaluations that had taken place earlier. If there are no other questions, I simply ask you to affirm the judgment. Thank you. Thank you. Mr. Yetta? Your Honors, I submit that Mr. Riley is, errs when he tells you that there must be a showing of substantial harm for the failure to have a research-based peer-reviewed program in effect. The rule is whether, and in GS v. Cranberry Township, it was a per curiam opinion, I don't know if you wrote it, Judge Rendell, or not, but you were on the panel, states that the FAPE requirement, states meet the FAPE requirement by creating for each disabled student an individualized educational plan which sets out a package of educational and related services designed to meet the unique needs of the disabled child. Quoting Ferren C. But isn't the point that it has to provide a meaningful benefit, which is somewhat, you know, it's not forward-looking, it's what is happening here? There has to be some evidence that it's not working, or else, as Mr. Riley said, everybody's going to rush in because they don't like the program, even though the program might work? Actually, I think that's not correct. The IEP, at the moment it's written, must be designed to provide FAPE. And if the parents conclude that it does not provide FAPE, they may take a child and place that child in a private placement and seek tuition reimbursement, and then it becomes for the hearing officer to decide whether the IEP, as written, failed to provide FAPE. And that's what we submit happened here. So it's not substantial harm, it's whether FAPE was provided for this unique child with her unique needs, as your panel has previously stated. As to the issue about research-based, I do want to note that Ridley actually, in their petition for review, their first filing, which became the complaint in this case, conceded at 76, the appendant, paragraph 13, that the program must be research-based. They write it in their own initial filing. So that's not really in debate from Ridley's point. What is there in the record before anybody here that says to us, chapter and verse, this is exactly what is required for this student, this is what was provided, and these are the deficiencies? I mean, we're not experts, we're not scientists. And I think we need to know, where is it in the record that says, aha, in order to fill this you need, bing, bing, bing, bing. This had bing, bing. Therefore, these three things are totally lacking. If I may steal your aha, your point is exactly why the law is that the district court does not substitute its opinion of educational policy for the state, and why this court also does not substitute its opinion for educational policy. I don't find in the hearing officer. Pennsylvania has declared that the hearing officer is the one who decides. The hearing officer heard the testimony, heard the district's own teacher and special ed director say that it doesn't have, that the program is not research-based design for this child's needs. There's no evidence of that. And if you look at the IEP, all the- That's not what the hearing officer said. Didn't say it's not designed for this child's needs. Didn't say that. Ultimately said that it's not special, there's no specially designed instruction in the IEP to meet this child's needs. And if I can just go to Judge Fisher's point, I'm out of time. All right, you can conclude, you can wrap up. Judge Fisher, you asked about the beginning of this school year. Why it took so long to evaluate. And Mr. Riley has expanded it to two months. Actually, the testimony was a month or so of his kindergarten review. But the fact is that the school district concealed from parents elements that were necessary for her to exercise her rights under the IDEA. Namely, knowing that this child had been placed on a reading watch list. That this child was being reviewed by the school district. And she never knew that. She was the one, when she found out all this in November, who asked for that evaluation. The school district never initiated it. Thank you very much. Thank you, counsel. The case was well argued. We'll take it under advisement and ask the court to recess court.